State *ex rel.* Ovie G. Hall

*v.*

Orel J. Skeen, *Warden, etc.*

(No. 10445)

Submitted January 10, 1952. Decided January 29, 1952.

D. *Jackson Savage,* for relator.

*William C. Marland,* Attorney General, *W. Bryan Spillers, Assistant Attorney General,* for respondent.

Fox, Judge:

On May 14, 1946, in the Circuit Court of Logan County, the relator, Ovie G. Hall, and William Smith and Meldon Armstrong were jointly indicted for the crime of armed robbery, and on May 17, 1946, there was an informal arraignment of the defendants to the said indictment for the purpose of ascertaining in what cases trials would be required. At that time Smith and Armstrong indicated their intention to plead guilty to the charges against them, but Hall, the relator, indicated his purpose to plead not guilty, and to demand a jury trial, and his case was then set for May 24 following. The record is silent as to whether a formal plea of not guilty was entered on May 17, and it is uncertain whether at that time counsel was assigned for his defense, the indication being, however, that counsel was not assigned until May 24, the date set for his trial. In any event, on May 24, 1946, when his case was called for trial, he had the benefit of counsel appointed by the court. It is clear that counsel consulted with relator, along with the other two defendants to the

indictment, and had the benefit of the file prepared by members of the Department of Public Safety on the case. Following a conference between counsel, relator and the other two defendants, a plea of guilty was entered by the relator. The order in the case showing such plea of guilty and the judgment entered by the court, and the sentence imposed, reads as follows:

"This day came the State by her attorney, and the prisoner was brought into court and set to the bar in custody of the Sheriff; whereupon the prisoner for plea saith he is guilty in manner and form as the State in her indictment against him hath alleged; whereupon the court proceeded to enter judgment in accordance with said plea, and fixed the prisoners term of confinement in the Penitentiary of this State for and during the remainder of his Natural Life.

"It is, therefore considered by the court that the warden of the penitentiary of this State as soon as convenient after the adjournment of this term of the court, cause the said Ovie George Hall to be conveyed to the Penitentiary of this State, at Moundsville, in the County of Marshall, and that he the said Ovie George Hall be there imprisoned for and during the remainder of his natural life aforesaid, in accordance with the usages and customs of that institution. And the prisoner was remanded to jail."

On November 13, 1951, the relator, in the name of Ovie G. Hall, filed in this Court his petition for a writ of *habeas corpus ad subjiciendum*, the pertinent allegations of which petition read as follows:

"I was arrested in the county of Johnson in the State of Kentucky, March 18, 1946, on a charge of armed robbery in the County of Logan, State of West Virginia and waved extradiction to said State and County and was returned by State Police. During the May term of the Logan County Grand Jury, I was indicted, jointly with William Smith and Meldon Armstrong, on armed robbery. It is my contentions that I am not guilty of armed robbery because I was forced by gun point to go with Smith and Armstrong. I have

witnesses and affidavits to substantuate my story. Along with Smith and Armstrong, I was taken before the Honorable Judge C. C. Chambers, Logan County Circuit Court Judge. Smith and Armstrong entered pleas of guilty to the armed robbery indictment, but I told Judge Chambers I was not guilty. Judge Chambers told me I was indicted jointly with Smith and Armstrong, and since *the* entered pleas of guilty, he could not accept my plea of not guilty. I asked for a trial, so that I could put my witnesses on the stand, to witness in my behalf, but Judge Chambers denied me that right. He appointed me an attorney, namely, a Mr. Damron, Jr. from Logan but said lawyer said I would have to plead guilty because Smith and Armstrong had admitted their guilt. I refused my lawyer's advise, and he refused to prepare my case for trial even though there was witnesses in the Court Room waiting to testify in my behalf. I was again taken before the bar and Prosecutor Chauncey Browning told Honorable Judge Chambers that I was guilty, so there was no further need for talk. Judge Chambers lined me up before the bar along with Smith and Armstrong and sentence one by one. My sentence was a life sentence in prison. There was nothing I could do or say to prevent Judge Chambers from passing sentence upon me. Even a stranger got up and talked in my behalf. His name was Attorney W. E. Flannery. Sir I am ignorant in the ways of proper Court procedure. I have never attended school. I can only say that I did not plead guilty. I only admitted that I accompanied Smith and Armstrong on threat of my life. I have affidavits to prove my contentions. The names of my witnesses are, Wendell Smith, Doris Hall, Willie Perry and Elzie Hall. These witnesses will prove beyond a doubt that I was refused a trial by Jury. Thomas Allen the taxi driver that was alleged to be robbed will testify in my behalf. It is difficult to try and contact all of my witnesses in this behalf, but I swear to the truth of this petition.

"Conclusion

"Your Petitioner says his conviction of armed robbery was illegal and contrary to law, and he

asks to be freed out from under the life sentence he is serving. Re: United States Constitution: Amendment VI. Quote: In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, 'skip' and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense. 'End Quote' Your petitioner was denied the right to a public trial, the chance to call witnesses in his behalf. Your Petitioner was denied the assistance of counsel, and therefore asks to be freed out from under the life sentence he is serving. From testimony in my case history it can readily be shown that my attorney refused to assist me in any way. Also I was denied the right to have my witnesses take the stand in my behalf.

"Prayer: Therefore good and sufficient cause having been shown that your petitioner is illegally confined, petitioner asks that the Respondent named herein, show cause why he shouldn't be freed."

This petition was accompanied by affidavits of Doris Hall, Wendell Smith, Elzie Hall and William Perry. The affidavit of Doris Hall is to the effect that Smith and Armstrong forced Ovie G. Hall to accompany them to the point where the alleged armed robbery was committed, and also to the effect that Judge Chambers would not permit Hall to plead not guilty and have a trial because he was indicted jointly with Smith and Armstrong. The affidavit of William Perry is to the effect that Hall was forced by Smith and Armstrong to accompany them to the point where the alleged armed robbery was committed. The affidavit of Wendell Smith is to the same effect. The affidavit of Elzie Hall is to the effect that the relator, Ovie G. Hall, was forced by Smith and Armstrong to accompany them to the point where the alleged armed robbery was committed, and also to the effect that Judge Chambers refused Hall a trial because he was charged jointly in the indictment with Smith and Armstrong.

On November 19, 1951, this Court issued a writ of *habeas corpus*, directed to the respondent, Orel J. Skeens, as warden, ordering him to produce the body of relator on Tuesday, December 11, 1951, and show cause why he was being detained. On that date, respondent appeared and produced the body of relator as commanded, and filed his answer to relator's petition which denied any illegal detention of relator; denied that petitioner was confined in the penitentiary of the State in violation of the Constitution of West Virginia or the Constitution of the United States; and calling for strict proof of the allegations contained in relator's petition. Following the granting of the writ, this Court, of its own volition, appointed D. Jackson Savage, a member of the Kanawha County Bar, and a member of the bar of this Court, to represent the relator in the prosecution of his petition, a duty which the said Savage undertook, which he has performed with marked fidelity and ability, and for which he has earned and received the commendation of the Court. On the return day of the writ, counsel for relator requested a continuance of the case to permit further investigation, and if necessary the taking of evidence. This request was granted, and the case was set for the first day of the January Term, 1952. Later in December, 1951, testimony on the part of relator, and on the part of the State, was taken at Logan, and has been duly certified, filed and considered by the Court.

The fundamental law on the awarding of a writ of *habeas corpus*, as the same affects the judgments of a court having jurisdiction of the person and the subject matter, as in the case at bar, is well stated in two early decisions of this Court, the first being *Ex Parte Mooney*, 26 W. Va. 36, and the other being *Ex Parte Evans*, 42 W. Va. 242, 24 S. E. 888. In the *Mooney case*, it is held:

> "When a party is imprisoned under a judgment or order of a court having jurisdiction to make such order, he can not be discharged on *habeas corpus*, however erroneous such judgment or order may be; but it is otherwise if the court

had no jurisdiction to make the order or judgment."

In the *Evans* case the holding was:

"The remedy for mere irregularity in the process or mere error in the proceedings of courts of competent jurisdiction is by appeal or writ of error, not by *habeas corpus;* otherwise if the process or proceedings be void."

See also *Ex Parte Bornee,* 76 W. Va. 360, 85 S. E. 529; *Ex Parte Page,* 77 W. Va. 467, 87 S. E. 849; *Nutter* v. *Mace,* 130 W. Va. 676, 44 S. E. 2d. 851; *Dye* v. *Skeen, Warden,* 135 W. Va. 90, 62 S. E. 2d. 681.

In awarding the writ in this case, it was assumed by this Court that if the allegations of relator were shown to be true, the Circuit Court of Logan County was without jurisdiction to impose any sentence; and that its action in imposing a sentence in the absence of a plea of guilty, or of proof of the crime, made the sentence imposed absolutely void. If this be true, then the order that was entered by the circuit court, which shows a plea of guilty, must, in the very nature of things, be open to contradiction, otherwise there could never be a showing that no plea of guilty had been entered, or that the court had refused to accept a plea of not guilty, as is contended in this case. The authorities cited by the State in support of the contention that the order of the circuit court which shows the entry of the plea of guilty imported a verity, and could not be disproved, are not convincing. At most these cases bear on the question of collateral attack on court records. But if the action of a court can be shown to have been without jurisdiction, and to be void, the general rule is that a direct attack may be made at any time and in any proceeding, and this is particularly true in *habeas corpus* cases, where relief depends on a showing that the proceeding under attack was void from the beginning. We think, therefore, that relator was entitled to a hearing on the allegations of his petition, and that he is not precluded from showing facts surrounding his arraignment and plea by the fact that a court

order exists showing the entry of a plea of guilty, which,. if true, would preclude relief.

This leaves open the question as to whether relator has established the allegations of his petition. There can be no question but that relator on May 17, 1946, indicated his purpose of pleading not guilty on the ground that he was forced to paticipate in the crime for which the three defendants were jointly indicted, the crime of armed robbery; and it appears that he persisted in this contention up until the time when he was actually arraigned, and certainly until he had consulted with his counsel and the other two defendants. The principal question here is whether, after he had consulted with counsel, he abandoned his defense and decided to plead guilty, and whether he carried out that purpose. The strongest witness to the effect that he did not do so is his brother Elzie Hall, and his statement is that relator, in addressing Judge Chambers, said:

"'Judge, I am not being treated right in this matter.' He said, 'Because I am not guilty.' The Judge said, 'You are indicted.' He said, 'Yes, but I was forced to do this crime. I was made to do the crime.' The Judge said, 'Well, anyhow you actually done it, didn't you?' My brother said 'Yes, but I was forced to do this,' and the Judge said, 'Now I am telling you to sit down.' Of course, this is just the best I remember it the way I am telling you, and the best I can remember that part of it, the Judge said, 'Well, you actually done it,' and my brother said, 'Do you mean to say you are going to give me time without a trial?' The Judge said, 'You are jointly indicted in this case with these other boys and you just as well sit down.' He said, 'I have heard enough out of you and I wouldn't believe you no how being brought up in a case of this kind.' Now that is the best I can remember it."

The witness stated that relator stood up at the bar of the court and was asked by the judge or clerk whether he was guilty or not guilty, to which he answered:

"He was asked if he was guilty or not guilty

some several times and he says, 'I not guilty of being willing to do it.' He said, 'I am guilty of doing it but they made me do it.' He held out for that all the way through, that they forced him into it, that they was going to kill him, and Bill Harmon and Wendell Smith was here to swear positive that he was at their house at the time when the boy come and put the gun on him and took him off the back porch where he was hid behind a washing machine to keep from going with the boys when they come for him."

The contention of the witness throughout is that the plea of the relator was "I am not guilty. I am not guilty, Judge, of wanting to do this crime. I am guilty of being forced into it. I actually was there but it was against my will." And he contended that he had witnesses to establish that contention. The testimony of another brother, John Lee Hall, is to the same effect. The testimony of relator's mother, Martha Hall, is largely confined to the statement that Hall was told by the court to sit down, and that "I don't want to hear no more from you." To the same effect is the testimony of Doris Hall, sister-in-law of the relator. Melvin Ward, who was present in the courtroom, testified that the relator made several efforts to be heard, and that he wanted to plead not guilty but that before he got through he said he was guilty of being in the company of the men when the crime was committed, but was forced to go with them. There is considerable testimony that Hall persisted in qualifying his plea of not guilty, relying on the contention that while he may have participated in the crime, he was forced to do so. Support for this contention is asserted because of a newspaper report published at the time, and prepared by a witness who wrote the report and testified to the correctness of the statements contained therein. Of course, the newspaper article, in itself, is of no value as evidence, but the testimony of the writer of the article as to what actually occurred is considered. It in general supports the theory of relator that his plea of guilty was qualified, and that he was asking to be heard and was told to sit down, and, in effect, refused a hearing. There

is also testimony in the case that the defendant, Armstrong, who had been given a life sentence, was complaining to the court of the severity of sentence, and that he was told to sit down, and that the court had heard enough from him, which leads to the contention on the part of the State that, for whatever it is worth, the court's command to sit down was directed to Armstrong and not to Hall. The contention of the State is that Hall made no protest and made an unconditional plea of guilty.

Judge Chambers testified in the case and his testimony on the particular point of the plea of guilty is as follows:

"My recollection is that Hall and two others, Armstrong and Smith, as I remember, were indicted jointly for armed robbery, two cases, one being a man named Allen and the other one I forget his name. We have a custom over here of having plea day, which is the first Friday of the first week of Court. All men indicted are brought out and if they want to plead guilty their plea is taken; if they want a trial they are given a trial. My recollection is when these three young men's cases were called Armstrong and Smith pleaded guilty. I took their plea. Hall said he was not guilty and wanted a trial and I set his case down for a later day in the term, I do not remember the date now. Then on the morning the case was set for trial Hall's case was called. As I recall I appointed a lawyer to represent him because he had no lawyer and no money. His lawyer took him back in the witness room and conferred with him and as to what happened there, I do not know. They came back in and the lawyer came up to the bar, as they usually do, and said his client wanted to enter a plea, so I read the indictment to him and asked him what his plea was. He pled guilty. The statement that he made that he was denied the right to plead not guilty is absurd. Nothing like that happened. After he entered his plea of guilty then I sentenced him and the other two who had not been previously sentenced to terms in the penitentiary. I recall that the prosecuting attorney talked about filing an information against Hall on account of three or four previous convictions, but remem-

bered that I could impose life imprisonment under the present indictment, so he did not file any information and I sentenced Hall to the penitentiary of this state for the rest of his natural . life on this armed robbery charge."

When asked if he recalled any circumstances, after the plea of guilty and after he had been sentenced, in trying to change his plea, he replied:

"Nothing like that happened. I do recall Armstrong, who was from Texas and who had a bad record and who appeared to be drunk that morning, that I asked him where he got his liquor and he denied being drunk, but he was obviously drunk or under the influence of dope, and he made the remark that life imprisonment looked like it was too much for a little affair of robbing a taxi driver. Hall made no statement of any kind although I recall asking him if he had anything to say, as I always do, and he made no statement."

Later on being recalled, there was quoted to Judge Chambers a part of relator's petition as follows: "Judge Chambers told me I was indicted jointly with Smith and Armstrong, and since they entered pleas of guilty, he could not accept my plea of not guilty.", and when he was asked if he remembered making such a statement, he replied:

"I did not make any such statement. That is utterly absurd. Every lawyer knows that any man charged with a crime has a right to enter a plea of not guilty, and I might say further that I don't accept reluctant pleas or half-way pleas. A man has to state unequivocally whether or not he is guilty or not guilty, and if he hesitates and says that he just as well plead guilty or something like that, I will not accept that sort of plea. I tell him that he is entitled to a trial and I will see he gets a fair trial."

He then said:

"I might say further, for the benefit of the record, that that statement is not only utterly false but this man Hall, when the indictment was

read to him, and when I asked what his plea was, said that he was guilty. There wasn't any qualification and no equivocation, and I asked him if he had anything to say, and as I recall he nor the other two defendants said anything. Then I proceeded to pronounce sentence. I gave two of them life, as I recall, and one forty years in the penitentiary, the two being given life because of the previous convictions and incarceration for felonies. It was after the sentence was imposed that Armstrong caused the confusion. None of them, as I recall, said anything or indicated they had anything to say prior to the passage of sentence."

The prosecuting attorney of Logan County testified that he recalled pleas of guilty on the part of two of the defendants, and he recalled when the indictment against Hall, Smith and Armstrong was first called on plea day, two of the defendants pleaded guilty, and one of them said he was not guilty and asked for a trial. He testified that on the day set for the trial he was in court and ready for trial, and the State's witnesses were present. That Hall, after conferring with his counsel, came back into the courtroom and entered a plea of guilty. When asked whether Ovie G. Hall qualified his plea in any way he said:

"I recall some confusion with regard to the case and do recall that Armstrong was either drunk or under the influence of some narcotic and that he was in a belligerent mood and spent most of his time staring at me in a belligerent manner and I think he made some threats toward me as he left the court room, as to what he was going to do to me, and so my attention was focused mostly as to what happened that morning with reference to Armstrong. I don't have any independent recollection of what transpired, if anything different from the usual, in the plea of Hall and his sentencing."

He stated that no promise of clemency was given to relator to bring about his plea, and as far as he knew the plea was voluntarily made. The effect of his testimony was that he had no independent recollection of

what actually occurred and no recollection of anything unusual happening. The testimony of Oval D. Damron was that he was named to represent the relator; that he looked over the State Police records and consulted with the relator and advised him to enter a plea of guilty. He said Hall was reluctant at the time he talked to him about entering the plea, and contended he had been forced to participate in the robbery, but that after going over the reports and talking to witnesses he agreed to plead guilty and did so. He states that if Hall had insisted upon entering a plea of not guilty, he would have made for him the best defense he could. Jack Milam, a member of the Department of Public Safety, was present in the courtroom on May 24, 1946, and summoned as a witness for the State. He stated that Judge Chambers read the indictment to Hall and he entered a plea of guilty and the three defendants were sentenced to the penitentiary. When asked if he recalled any confusion that took place, he answered:

> "No sir; I think I can straighten this newspaper clipping thing out. Now for the matter of the Judge setting them down, that was Armstrong. In fact he stood up that day right there and I stood up by this man Armstrong because I did not know what might happen. He was really tough and when he began making remarks to the Judge and Mr. Browning I did stand up by him because I thought I might have to take hold of him."

He did not remember that relator stood up at any time to make any statement, and he did not remember having any trouble at all with the relator. Jay Rowe, another member of the Department of Public Safety, was present at the time of the plea, and when asked what he remembered about the occasion said:

> "I know they brought the three over from the jail and of course around the Court, as usual, they talked a little and Mr. Damron took them all out and was talking to them in the room back there and when he came back in I don't know just what words he said or how it was but the

Hall boy entered a plea of guilty and it was the usual Court procedure, as far as I know, just from looking on."

When asked if there was any confusion during the proceedings he answered:

"No, only this man Armstrong, who is from Texas, I understand, and who we understood from his own admission took dope, and we thought from the way he talked that he was liable to do something and he caused a little confusion but I don't remember just what it was, it has been so long."

He stated that before passing sentence, the judge asked each of the defendants if they had anything to say, but he did not recall that any of them took advantage of that opportunity to speak for themselves.

In relator's petition there is an allegation that a stranger, naming him, got up and talked in his behalf. That stranger was not called to testify, nor if he was unavailable was that fact shown. We have endeavored to present every fact and statement bearing upon the truth of the allegations in this petition. The only question now remaining is to determine whether, under the evidence, sufficient facts and circumstances have been developed to justify this Court in declaring that the judgment and sentence of the Circuit Court of Logan County, entered on the 24th day of May, 1946, was absolutely void. Unless we can so find, the writ heretofore awarded must be discharged.

We have reached the conclusion to discharge the writ because, in our opinion, the evidence does not warrant us in sustaining the contention of relator that he did not enter an unconditional plea of guilty to the charge of armed robbery lodged against him. Undoubtedly, the Circuit Court of Logan County had jurisdiction of the crime, and of relator who was charged with the commission of that crime. Under the provisions of Code, 61-2-12, such circuit court was vested with the power to impose a sentence of life imprisonment, based upon the plea of

guilty which, we think, on advice of counsel, the relator entered when the indictment against him was read, and he was asked to make his plea. The evidence to the contrary is not convincing. In the first place there is the inherent improbability that any judge of a circuit court in this State would, in any case where a person is charged with a crime for which he could be deprived of his liberty for his natural life, or in any other type of a charge of crime, refuse to permit the entry of a plea of not guilty, or deny any person in such circumstances the right to a trial by jury. These are common law and constitutional rights, familiar not only to lawyers and judges, but to laymen as well. VI and XIV, Amendments, Constitution of the United States. Sections 10 and 13, Article III, Constitution of this State. Without the strongest and most convincing evidence, we are unwilling to assume that the judiciary of the State of West Virginia has fallen to the level of depriving persons charged with crimes of these fundamental rights.

The witnesses who testified as to what relator may have said on occasions when he was sentenced, either before or after his sentence, were, for the most part, illiterate, and unacquainted with court proceedings. According to their own statements, they were seated in a section of the courtroom where it is doubtful whether they could always see and hear what was taking place, and generally speaking, not qualified to follow the procedure as would one who was more familiar with court procedure. This does not apply to the newspaper reporter who may have occupied a more favorable position, but even newspaper reporters have been known to misunderstand, and unintentionally, of course, incorrectly report court proceedings. On the other hand, we have the testimony of the prosecuting attorney, that of relator's counsel, and of two members of the Department of Public Safety, all of whom were present at the time the plea was entered, and who remember nothing unusual in connection with the procedure on that day.

Damron, counsel for relator, appointed by the court,

stated that he consulted with his client, in the presence of the other two defendants, had the benefit of the police files which, we assume, informed him of what the State's case would be, and stated that while reluctant to do so, the relator finally decided to accept his advice and enter a plea of guilty, and that he did so. He recalled nothing unusual about the case after the plea was entered. We are precluded from passing upon the merits of relator's contention as to his being forced to commit the crime for which he was charged, but we must take into consideration how any capable lawyer would react to that character of contention, as bearing upon the good faith of his advice to relator that he should confess. We do not know what the police files, of which relator's counsel had access, contained, but it is fair to assume that it was not favorable to relator's case. Looking at the situation from all standpoints, we are not disposed to criticize relator's counsel for the advice he gave. Perhaps he should have asked for a delay for further investigation of the case, but on the face of things, with two of the three participants in the crime admitting their guilt, and relator at all times confessing his presence and activity in connection with the actual commission of the crime, there is little probability that a further investigation would have resulted in anything favorable to the relator. The testimony of the two state policemen is not important in a positive way, but is still strongly corroborated by the testimony of Damron, Judge Chambers and the prosecuting attorney to the effect that there was nothing unusual about this procedure. As they understood it the matter was more or less one of routine. The only confusion they remembered grew out of the activities of the defendant Armstrong who was intoxicated and inclined to be troublesome.

But there is one witness who played the principal part in the proceeding, and whose testimony is clear, direct and unequivocal, and that is the judge who sentenced relator to imprisonment in the penitentiary. Judge Chambers recalls that on plea day relator indicated his pur-

pose to plead not guilty, and demand a jury trial, and that his case was set for a later day. He appointed counsel to defend him, but does not remember the date that appointment was made. He remembers that on the day set for trial counsel appointed by him consulted with relator and the other defendants, and that when they returned to the courtroom he was informed that relator had decided to enter a plea of guilty; that the indictment was then read to him, and when he was asked what his plea was, the answer was a plea of guilty; whereupon he was sentenced along with the other defendants. He testifies that his plea was not qualified in any way; that he did not accept qualified pleas, and, as this opinion will show, denied specifically that there was any protest on the part of Hall after he made his plea. In the face of the statement of Judge Chambers, supported as it is by other testimony in the case, the finding of this Court must be that relator has not established any fact or facts on which this Court could base a judgment that he was deprived of any constitutional right in the trial of his case. This being true, we must also hold that the judgment of the Circuit Court of Logan County, entered on May 24, 1946, sentencing relator to imprisonment in the penitentiary of this State for a term of his natural life was a valid and legal judgment, and must stand.

It follows, therefore, that the writ of *habeas corpus ad subjiciendum* heretofore awarded in this proceeding will be discharged, and the prisoner remanded to the custody of the respondent, the warden of the penitentiary of this State to serve the sentence imposed upon him.

*Writ discharged.*